1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MONTE TAYLOR,

11          Petitioner,                    No. CIV 05-2528 FCD KJM P

12      vs.

13   MATTHEW CATE, Secretary of California
     Department of Corrections and Rehabilitation,
14   et al.,[1]
            Respondents.                   FINDINGS AND RECOMMENDATIONS
15   _____/

16          Petitioner is a state prison inmate proceeding with counsel on a petition for a writ

17   of habeas corpus under 28 U.S.C. § 2254 challenging his Butte County convictions of vehicular

18   manslaughter with gross negligence and felony child endangerment and the three strikes sentence

19   of fifty-years-to-life that flowed from the court's finding that petitioner had suffered three prior

20   serious felony convictions.  After lengthy proceedings on a motion to dismiss, the court is ready

21   to address the merits of the underlying petition.

22   /////

23   /////

24   /////

25   _____

26        [1]  The court substitutes Matthew Cate, the current secretary, for Roderick Hickman under
     the authority of Rule 25(d) of the Federal Rules of Civil Procedure.

I. <u>Background</u>

As background for the issues raised in the petition, the court relies on the Court of Appeal's factual recitation, which is consonant with this court's reading of the record of the state proceedings:

> Around 9:00 p.m. on October 25, 1999, Joshua Hughes, who was 10 years old at the time of trial, returned home with his sister from a Halloween party.  Their mother, Kathleen Taylor, and defendant, who was Taylor's husband, were at home.
>
> Joshua was in his mother's room when she awakened defendant and asked him to take her to the hospital.  She had a fever and complained of severe pain in her arm.  Joshua noticed defendant had difficulty getting dressed to go to the hospital and acted like he had been drinking.
>
> Joshua accompanied Taylor and defendant to the hospital in a small white car.  On the way, defendant was "not [driving] very well."  He was going fast and passing other cars, which scared Joshua.  When Joshua asked him to be careful, defendant told Joshua to shut up.
>
> At the hospital, Taylor was examined and given pain medication.  When she emerged from the examining room, she was in a wheelchair, had a decreased level of consciousness, and had to be helped into the car by Matthew Morrow, the emergency room security guard.  Morrow observed that defendant was moving very slowly and that he spoke very quietly and slowly.
>
> Accordingly to Joshua, defendant's driving was even worse on the way home.  He drove faster, passing other cars in a dangerous fashion and hitting the gravel on the side of the road.  Taylor leaned her head against defendant's shoulder one or two times and he shrugged her off.  When defendant drove around a curve, the car went off the road and rolled.  At the time of the crash, Taylor was leaning against the window, not against defendant.
>
> Shortly before the crash, Kirk Vineyard was driving on the same road and observed defendant's car approaching rapidly from behind.  Vineyard pulled out of the way into another lane, and defendant passed at a speed Vineyard estimated as 70 to 75 miles per hour.  According to Vineyard, the right wheels of defendant's car were in Vineyard's lane as he passed, and Vineyard had to veer away.  Defendant's car swerved back and forth, crossing both lanes from one edge of the road to the other.  Vineyard thought an accident would happen, and he began to slow down to avoid being involved.  Two other cars passed Vineyard's vehicle.  The crash occurred about two miles later.

2

Clinton Burke was in one of the cars that passed Vineyard, and Burke's girlfriend was in the other. Burke had been driving through Lookout curve when a small white vehicle drove past him at an excessive rate of speed. The car nearly ran Burke off the road by crossing into his lane, and then it did the same thing to his girlfriend. Burke decided to accelerate and catch up to the white car, but was unable to do so despite increasing his speed to 90 miles per hour. The white car was "all over the road," on one shoulder and then another, and then driving down the middle of the road in both lanes. After it passed an SUV, the white car veered sharply to the right and hit the dirt. The driver slammed on the brakes, and the car shot across the road, went into the center divide, and crashed.

Burke stopped and approached the car, which was on its roof, and saw a boy crawl out. Defendant was in the driver's seat. Vineyard was hesitant to help defendant out of the car because given "the way the car was driving [Vineyard] really didn't know what influence the driver might have been under." Taylor, who was dead, had been thrown 30 or 40 feet from the car. Defendant told Vineyard that Taylor had been driving.

Shelly Rogers, one of the nurses who treated defendant at the hospital, testified that defendant was lethargic when he arrived. She had difficulty obtaining a blood sample from defendant and was able to draw only a small amount of blood.

Mike Cafferata, another nurse at the hospital, stated that defendant had a decreased level of consciousness and was not acting as expected for the situation. At the direction of an emergency room physician, Cafferata administered Narcan (an antagonist drug that reverses the effects of narcotics). Defendant awoke, looked at the IV in his hand, and said, "You gave me Narcan, didn't you, motherfucker."

Toxicologist Nancy Enkema testified that a urine sample taken from defendant on the night of the crash contained Carisoprodol (a muscle relaxant), Meprobamate (a central nervous system depressant), and two other narcotic analgesics. Enkema explained that muscle relaxants act like alcohol, causing poor reaction time, inattentiveness, poor judgment, and drowsiness, which would cause a driver to weave and drive erratically. A blood sample drawn from defendant showed no blood-alcohol level and reflected that he had ingested morphine or hyrocodone.

Enkema also analyzed Taylor's blood, which showed that Taylor had a 0.08 percent blood-alcohol level and had ingested therapeutic levels of Demerol, Carisopordol, and Meprobamate.

/////

/////

3

A few days after the crash, defendant told Joshua to say that Taylor had caused the crash by leaning against defendant. This was the same story that defendant gave to the investigating officer on the night of the crash. Defendant also told the officer that Taylor had been driving.

*Defense*

Henry Rast, an accident reconstructionist, opined that the crash did not result from defendant failing to have control of the car. In his opinion, one set of wheels was on the pavement and the other was on the dirt just before the crash. Thus, as defendant drove back onto the pavement, he had to correct for the different road surfaces, and this led to the roll-over crash. According to Rast, the accident was consistent with someone having fallen onto the driver.

*Rebuttal*

Jerry Stites, who had training and experience in accident reconstruction, investigated the crash that caused Taylor's death. His investigation revealed that defendant drove on the shoulder of the road for 461 feet in one area and 122 feet in another before overcorrecting, returning to the pavement, and crossing the road. Stites disagreed with Rast's findings and opined that, if a driver reacted in the manner described by Rast, the driver was not in control of the vehicle.

Lodg. Doc. 1 at 2-5.

II. <u>Standards Under The AEDPA</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any

/////

/////

/////

/////

/////

/////

/////

1   claim decided on the merits in state court proceedings unless the state court's adjudication of the

2   claim:

3               (1) resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established federal law, as

4               determined by the Supreme Court of the United States; or

5               (2) resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented in the

6               State court proceeding.

7   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[2]  It is the habeas

8   petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  <u>See</u>

9   <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

10          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

11   different.  As the Supreme Court has explained:

12               A federal habeas court may issue the writ under the "contrary to"
                    clause if the state court applies a rule different from the governing

13               law set forth in our cases, or if it decides a case differently than we
                    have done on a set of materially indistinguishable facts.  The court

14               may grant relief under the "unreasonable application" clause if the
                    state court correctly identifies the governing legal principle from

15               our decisions but unreasonably applies it to the facts of the
                    particular case.  The focus of the latter inquiry is on whether the

16               state court's application of clearly established federal law is
                    objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor,

17               529 U.S. 362 (2000)] that an unreasonable application is different
                    from an incorrect one.

18

19   <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

20   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

21   fails to cite or fails to indicate an awareness of federal law.  <u>Early v. Packer</u>, 537 U.S. 3, 8

22   (2002).

23   */////*

24

25        [2]

26     Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for
   entitlement to habeas relief.  <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007).

1    The court will look to the last reasoned state court decision in determining

2    whether the law applied to a particular claim by the state courts was contrary to the law set forth

3    in the cases of the United States Supreme Court or whether an unreasonable application of such

4    law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

5    919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

6    of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

7    must perform an independent review of the record to ascertain whether the state court decision

8    was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

9    words, the court assumes the state court applied the correct law, and analyzes whether the

10   decision of the state court was based on an objectively unreasonable application of that law.

11          "Clearly established" federal law is that determined by the Supreme Court.

12   Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to

13   look to lower federal court decisions as persuasive authority in determining what law has been

14   "clearly established" and the reasonableness of a particular application of that law.  Duhaime v.

15   Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003),

16   overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

17   782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court

18   precedent is misplaced).

19   III.   Ineffective Assistance Of Counsel

20          Petitioner argues that trial counsel was ineffective in two respects: he failed to

21   move to dismiss petitioner's prior strikes and he failed to seek an order reducing his convictions

22   for vehicular manslaughter with gross negligence in violation of California Penal Code

23   § 192(c)(1) and felony child endangerment in violation of California Penal Code § 273a, both of

24   which are "wobblers"[3] to misdemeanors.  Mem. P. & A. in Supp. Pet. (Pet.)[4] at 9-15

25

26          [3]   "'[W]obbler' is a legal term of art of recent vintage, and its use is limited primarily to
     attorneys, judges and law enforcement personnel who are familiar with criminal law. (See, e.g.,

6

1    These claims were not raised on direct appeal, but rather in a state habeas petition.

2 Lodg. Doc. 4.  The last reasoned opinion on these issues was issued by the Butte County Superior

3 Court, which said only that "petitioner has failed to demonstrate . . . that counsel's performance

4 fell below acceptable standards in some respect."  Lodg. Doc. No. 5 at 2.  The California

5 Supreme Court denied a petition raising the same claims without comment.  Lodg. Doc. No. 7.

6    The federal law on claims of attorney ineffectiveness is clear:

7    First, the defendant must show that counsel's performance was
     deficient.  This requires showing that counsel made errors so
8    serious that counsel was not functioning as the 'counsel'
     guaranteed by the Sixth Amendment.  Second, the defendant must
9    show that the deficient performance prejudiced the defense.

10 Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

11 whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.

12 However, a court must "indulge a strong presumption" that counsel's conduct falls within the

13 range of competence.  Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986).  An attorney is not

14 ineffective for failing to file a frivolous motion.  Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir.

15 1996) (failure to take futile action not ineffective).

16    It also is petitioner's burden to establish prejudice:  "A defendant must show that

17 there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

18 proceeding would have been different.  A reasonable probability is a probability sufficient to

19 undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  When the particular claim

20 is the failure to file a motion, there are additional requirements for the showing of prejudice:   a

21 habeas petitioner must show that the claims that should have been raised in the motion were

22

23 People v. Municipal Court (Kong), (1981) 122 Cal.App.3d 176, 179, 175 Cal.Rptr. 861 n.3
   ("Wobblers" are "those offenses punishable either as felonies or misdemeanors, in the discretion
24 of the court.  In the jargon of the criminal law, [such] offenses are known as 'wobblers." Robert
   L. v. Superior Court, 30 Cal.4th 894, 902, n.9 (2003)).

25

26    [4]  The petition is filed in two parts, appearing at docket numbers 1 and 1-2.  Page
   references are to the numbers assigned by petitioner's counsel, at the bottom of each page.

1    meritorious and that there is a reasonable probability that the results of the proceeding would

2    have been different if the motion were granted.  Kimmelman v. Morrison, 477 U.S. 365, 375

3    (1986).

4           In People v. Superior Court (Romero), 13 Cal.4th 497, 529-30 (1996), the

5    California Supreme Court found that under the Three Strikes Law, a trial judge has the discretion

6    to dismiss a prior felony conviction allegation even over the prosecutor's objection.  And in

7    People v. Superior Court (Alvarez), 14 Cal.4th 968, 977-79 (1997), the Supreme Court found

8    that California's Three Strikes Law had not stripped a court of its discretion under California

9    Penal Code § 17(b) to reduce a wobbler to a misdemeanor even when the defendant has prior

10   convictions alleged to be strikes.

11          The standards for striking strikes and reducing wobblers are similar.  In People v.

12   Williams, 17 Cal.4th 148 (1998), the Supreme Court said that when considering whether to strike

13   a defendant's prior strikes:

14              [T]he court in question must consider whether, in light of the
                nature and circumstances of his present felonies and prior serious
15              and/or violent felony convictions, and the particulars of his
                background character, and prospects, the defendant may be deemed
16              outside the scheme's spirit, in whole or in part, and hence should
                be treated as though he had not previously been convicted of one or
17              more serious and/or violent felonies.

18   Id. at 161; see also People v. Carmony, 33 Cal.4th 367, 376-77 (2004) (court does not abuse its

19   discretion in refusing to strike a prior unless it concludes that an exception should be made "for

20   articulable reasons which can withstand scrutiny . . . .").  Striking a prior serious felony is "an

21   extraordinary exercise of discretion. . . ."  People v. Philpot, 122 Cal.App.4th 893, 907 (2004).

22   /////

23   /////

24   /////

25   /////

26   /////

1         When considering whether to reduce a wobbler to a misdemeanor, a court must

2    base its discretionary decision on

3         those factors that direct similar sentencing decisions . . .including
     the nature and circumstances of the offense, the defendant's

4         appreciation of and attitude toward the offense, or his traits of
     character as evidenced by his behavior and demeanor at trial.

5

6    People v. Superior Court (Alvarez), 14 Cal.4th at 978; see also Cal. Rules of Court, Rule 421

7    (1998) (renumbered 1/1/2001).

8         Petitioner does not challenge the reliability of the probation report nor that of the

9    "criminal record summary" attached thereto. CT 163-174, 181-183. The latter shows that

10   petitioner's contact with the criminal justice system began in 1981 with a petty theft conviction,

11   followed in 1982 with a conviction for hit and run; he received short jail terms for both of these

12   convictions. CT 181. In 1983, he served jail time for petty theft with a prior petty theft

13   conviction, followed in 1984 by another petty theft and a trespass and, in a separate case, with yet

14   another petty offense with a prior; all of these convictions resulted in short jail terms. Id.

15   In 1985, he served an additional jail sentence for still another conviction of petty theft with a

16   prior and a misdemeanor drug possession charge. CT 182.

17        Petitioner was first sent to prison in 1986, for a robbery and a burglary, charged in

18   the instant underlying case as strikes. CT 14, 182. Two years later he was convicted of illegal

19   sales of hypodermic syringes and given a short jail sentence. CT 182. He was returned to prison

20   in 1988 for another petty theft with a prior conviction, which also constituted a violation of his

21   parole on the robbery conviction. Id.

22        After serving these prison sentences, petitioner received another jail term in 1989

23   for possession of drugs. In 1990, he received a five year term for another robbery, which was

24   alleged as another strike in this case. CT 14, 183. Although the report does not include

25   petitioner's parole date, it appears he had been released by 1994, for it notes that he married the

26   victim in 1994 in Reno. CT 165.

1    In 1998, he was convicted of a misdemeanor domestic violence charge.  CT 183.

2    The underlying offense occurred in 1999.

3    Petitioner argues that "from 1990 up and until the incident" petitioner had become

4    a law-abiding citizen, had started his own business and acted as a father to Joshua Hughes.  Pet.

5    at 12.  However, as noted above, petitioner was in prison during at least part of that time and in

6    fact was convicted of domestic violence.  CT 183.  There is little record evidence supporting his

7    claim that he had started a business.  Moreover, although petitioner may have acted as a father to

8    his wife's child, Joshua testified that petitioner asked him to lie about the accident so as to make

9    it appear that the victim had fallen against petitioner, thus causing petitioner to lose control.  RT

10   93-95; see also CT 165 (probation report indicating child supported by "child's mother").

11   Finally, the evidence at trial showed that petitioner was driving too fast, coming

12   too close to cars he passed, and having difficulty staying in his lane.  RT 145-146, 172-173.  The

13   blood sample taken from petitioner after the accident showed the presence of a central nervous

14   system depressant.  RT 284.  Petitioner initially claimed that the victim had been driving and, as

15   noted above, then suggested that the victim had unwittingly caused the accident by falling into

16   petitioner as he drove.

17   In light of petitioner's lengthy criminal record amassed before and after those

18   offenses that constituted strikes, his reckless driving, his attempts to foist the blame for the

19   accident on the victim, and his attempt to recruit his stepson to support his version of the

20   accident, he has not borne his burden of showing that had counsel moved to strike one or more of

21   the strikes or reduce the offenses to misdemeanors, the trial court would have found him to be

22   outside the scheme of the Three Strikes Law or would have exercised its discretion to reduce the

23   crimes to misdemeanors.  Accordingly, the trial court did not violate clearly established law in

24   reaching a similar conclusion.

25   /////

26   /////

1    IV.   <u>Evidentiary Rulings</u>

2           Petitioner challenges two of the trial court's evidentiary rulings: its decision to

3    admit evidence that petitioner's blood, drawn after the accident, contained meprobamate, a

4    central nervous system depressant and its decision to exclude evidence of the decedent's state of

5    mind, particularly evidence of her suicide attempts.  Pet. at 16-20.

6           In general, a state court's evidentiary ruling is not subject to federal habeas review

7    unless the ruling violates federal law, either by infringing upon a specific federal constitutional

8    right or statutory provision or by depriving the defendant of the fundamentally fair trial

9    guaranteed by due process.  See <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Jammal v. Van de</u>

10   <u>Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991).

11          A.  <u>Decedent's Mental State</u>

12          Petitioner filed a motion in limine seeking an order allowing him to present

13   evidence of the decedent's state of mind; he specifically sought to introduce evidence that she

14   had attempted suicide shortly before the accident and that on the night of her death, she received

15   treatment for extreme pain from the wound she inflicted during her suicide attempt.  CT 38-42.

16   His counsel argued that "Mrs. Taylor, under the influence of prescription medication and alcohol,

17   and in an agitated, emotional state, interfered with Mr. Taylor's driving, either deliberately or

18   accidentally, and that her actions were the proximate cause of the fatal accident."  CT 39; RT 18.

19   He argued that this position was consistent with the evidence, because Joshua said that "not only

20   did my client pull over to one side . . . and stop in a culvert area, that they were fighting and

21   arguing.  Thereafter, at least two occasions she was leaning up against him and that in response

22   my client was elbowing her and telling her to get off."  RT 20.  The court denied the motion.

23   RT 23-24.

24          Petitioner's counsel  revisited the issue after receiving further discovery which, he

25   argued, suggested the decedent's mental state had been even more precarious than he had

26   previously believed; he sought a mistrial because of the delayed discovery on what he deemed to

1  be relevant evidence.  RT 45-60.  The court denied the motion.  RT 63.  Thereafter, the court

2  reviewed the decedent's mental health records in camera and made "a finding there is no

3  evidence, relevant evidence in those records."  RT 269.

4          This claim was not raised during petitioner's direct appeal from his conviction,

5  but was included in the habeas petitions he filed in Butte County Superior Court and thereafter in

6  the California Supreme Court.  Lodg. Doc. 4 at 33-35; Lodged Doc. 6 at 28-29.  The Supreme

7  Court denied the petition without comment; the Butte County Superior Court checked a box on

8  its form habeas denial, which purports to deny the petition because the issues could have been,

9  but were not, raised on direct appeal.  Lodg. Doc. 5 at 2; Lodg. Doc. 7.  Respondent has not

10  argued, however, that this court is prevented from raising the issue because of the procedural bar

11  and so has waived the procedural argument.  Answer at 12-13; Trest v. Cain, 522 U.S. 87, 89

12  (1997).  Moreover, the court declines to raise the issue sua sponte because it is simpler to deny

13  the claim on the merits.  Windham v. Merkle, 163 F.3d 1092, 1100 (9th Cir. 1998); see Lambrix

14  v. Singletary, 520 U.S. 518, 525 (1997).  Because the state courts did not reach the merits of this

15  claim, it is subject to de novo review on federal habeas.  Slovik v. Yates, 556 F.3d 747, 752 n.4

16  (9th Cir. 2009).

17          A defendant has a right to present a defense, grounded in the Sixth Amendment

18  right to compulsory process and the due process right to a fair trial.  Chambers v. Mississippi,

19  410 U.S. 284, 302 (1973).  The Supreme Court has recognized, however, that the right to present

20  a defense is constrained by rules of relevance and considerations of probative value:

21          well-established rules of evidence permit trial judges to exclude
            evidence if its probative value is outweighed by certain other
22          factors such as unfair prejudice, confusion of the issues, or
            potential to mislead the jury.
23
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
24

25  /////

26  /////

12

> [T]he Constitution permits judges to exclude evidence that is repetitive . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

Holmes v. South Carolina, 547 U.S. 319, 326-27  (2006) (internal quotations omitted); see also Wood v. State of Alaska, 957 F.2d 1544, 1549, 1551 (9th Cir. 1992) (it is within trial court's discretion to determine which issues are relevant; even relevant evidence may properly be excluded if its probative value is outweighed by other legitimate interests).

The Ninth Circuit has directed a habeas court to use a five part balancing test to assess the competing interests:

> In a habeas proceeding, determining whether the exclusion of evidence in the trial court violated petitioner's due process rights involves a balancing test. In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense.

Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.), amended on other grounds, 768 F.2d 1090 (9th Cir. 1985).

Even if the exclusion of defense evidence amounts to constitutional error, it must have had "a substantial and injurious effect" on the verdict in order to justify federal habeas relief.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

To some extent, this is a non-argument.  One of the defense witnesses was Edward Foxley, the emergency room physician who treated Kathleen Taylor on the night of her death. RT 317.  By way of explaining why he remembered the decedent so vividly, Dr. Foxley mentioned the severity of her self-inflicted wound, which suggested to him that her suicide attempt was more than just a cry for help.  RT 330.  He mentioned the decedent's attempted suicide twice more during the course of his testimony as he discussed the medication he prescribed for her and the reasons for the particular prescription he provided.  RT 338-339.  Dr.

/////

1 Foxley also described the decedent's positive attitude about the physical therapy she had

2 undertaken after the self-inflicted injury to her arm.  RT 341.

3        In addition, the decedent's medical and mental health records have been included

4 in the clerk's transcript prepared in this case.  Even with this access to the records, petitioner has

5 not directed the court to anything suggesting that the decedent was suicidal on the night of her

6 death or that any such suicidal feelings would have caused her to be indifferent to the safety of,

7 or to endanger, her husband and son.  See CT II 1-191.[5]  Even though trial counsel suggested this

8 scenario as a reason for admitting the information, petitioner has utterly failed to support his

9 claim with the medical records.  CT 39.

10        Finally, as respondent notes, the thrust of the defense was that the decedent was so

11 physically debilitated by her pain and the medication administered at the hospital that she fell

12 into petitioner as he drove, causing him to lose control of the car.  See RT 125, 131-132.  Indeed,

13 this was consistent with petitioner's statement to Highway Patrol Officer Staton following the

14 accident.  RT 235 ("his wife kept leaning over, falling into him and that caused him to lose

15 control. . . .").  Any claim that it was decedent's emotional turmoil that caused the action would

16 have contradicted his own statement to the authorities.

17        The exclusion of this evidence did not violate petitioner's constitutional rights.

18     B.  Toxicology Evidence

19        Petitioner was charged with vehicular manslaughter with gross negligence,

20 resulting from his violation of California's basic speed law; he was not charged with gross

21 vehicular manslaughter while intoxicated.  CT 13-14; compare Cal. Veh. Code §§ 191.5,

22 192(c)(1).  Before trial, he filed a motion in limine to bar admission of evidence that his blood

23 and urine samples taken after the accident showed the presence of prescription drugs.  CT 33-36.

24

25     [5]  There are two Clerk's Transcripts identified as Lodged Document No. 10, and both
include the notation "Volume I" on the cover sheet.  For ease of distinction, the court refers to
26 the transcript comprising 699 pages (as opposed to 190 pages) as "CT II."

1   The court initially granted the motion, finding the material to be more prejudicial than probative

2   "in light of no expert that would be testifying" as to the amount of medication in petitioner's

3   system.  RT 8-10, 34-35.

4       The prosecutor filed a motion for reconsideration of this ruling and contended that

5   he would present an expert whose testimony would provide a "substantial nexus between . . .

6   what was found in the system and driving in this case."  CT 45-46; RT 65.  The court then

7   reversed itself and ruled the prosecutor would be permitted to offer this evidence.  RT 66.

8       Thereafter, toxicologist Nancy Enkema testified that petitioner's urine sample

9   showed meprobamate and carisopordol, which are central nervous system depressants and which

10  were by-products of the breakdown of the prescription drug Soma.  RT 284, 302.  These

11  compounds can produce "poor reaction time, poor response, poor judgment, erratic driving,

12  weaving, inattentiveness, slurred speech, drowsiness, even inappropriately falling asleep."

13  RT 286.  The prosecutor also presented evidence that following the accident, medical personnel

14  believed petitioner to be "more somulent [sic], sleepy, than seemed to be indicated for the

15  situation," that the emergency room physician directed a nurse to give petitioner Narcan, which

16  reverses the effects of narcotics or sedation, and that after the drug was administered to

17  petitioner, he "became awake," and said "you gave me Narcan, didn't you. . . ."  RT 223-225.

18      The Court of Appeal rejected the claim of error based on the admission of this

19  evidence:

20  > As pertinent here, section 192, subdivision (c)(1), defines vehicular
    > manslaughter as "driving a vehicle in the commission of an

21  > unlawful act, not amounting to [a] felony, and with gross
    > negligence."  The offense constituting the "unlawful act" need not

22  > be an inherently dangerous misdemeanor or infraction; it need only
    > be dangerous under the circumstances of its commission.

23  > Therefore, a violation of the speed laws is a sufficient unlawful act
    > if it was done in a dangerous manner.

24
    > Evidence that defendant had ingested narcotics and appeared to be

25  > under the influence was relevant because it tended to prove that his
    > violation of the speed laws was done in a dangerous manner and

26  > was grossly negligent.  Excessive speeding when one's judgment

15

and reaction time is impaired by the consumption of narcotics is dangerous.   Furthermore, the evidence tended to prove defendant was weaving from lane to lane and driving erratically as a result of his drug use, and not because Taylor was leaning against him as he claimed.

We disagree that the probative value of this relevant evidence was substantially outweighed by its prejudicial effect.  Defendant's violation of the speed laws was made more dangerous than usual by his use of narcotics, which Enkema explained would have slowed defendant's reaction time and made him drowsy and inattentive.  The fact that defendant was driving in the manner he did after ingesting narcotics was highly relevant, and it is not reasonably probable that the jury convicted him because it believed he was a drug addict and therefore had antipathy toward him. Rather, the evidence was overwhelming that he caused the death of his wife and endangered the life of his stepson by driving erratically and speeding excessively, with gross negligence.

Lodg. Doc. 1 at 7-8 (citations omitted).

The state court's determination that this evidence was relevant to the determination that petitioner violated the basic speed law with gross negligence is supported by state law.  See People v. Watson, 30 Cal.3d 290, 296 (1981) (A finding of gross negligence is made by applying an objective test: "if a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness"); see also United States v. Leonard, 439 F.3d 648, 653 (10th Cir. 2006) (in involuntary manslaughter based on fatal accident, no error in introducing evidence of defendant's prescription history to show his awareness of effect of medication; blood drawn after the accident was positive for these medications).  Moreover, this conclusion raises no constitutional issues. See Lisenba v. California, 314 U.S. 219, 227-28 (1941) ("The Fourteenth Amendment leaves California free to adopt a rule of relevance which the court below holds was applied here in accordance with the State's law.").

Petitioner argues that the admission of this evidence denied him a fair trial because there was no evidence beyond "mere inference that Petitioner may have been driving under the influence of a prescription drug. . . ."  Pet. at 17.  Indeed, he suggests, without any

1 | citation to the record, that the toxicologist's testimony established only that petitioner may have

2 | taken the drugs three days before the accident in this case. Id. This argument ignores the

3 | testimony from the nurse that, after the accident, emergency room personnel suspected petitioner

4 | was under the influence of a sedative or narcotic and administered Narcan, which in fact restored

5 | petitioner to full consciousness. RT 223-225.

6 | Finally, the court cannot find that the admission of this relevant evidence rendered

7 | petitioner's trial fundamentally unfair. Petitioner again suggests it was prejudicial because the

8 | expert could not quantify the results of the urine analysis and without that testimony, the jury

9 | could not have found gross negligence. Pet. at 18. As before, petitioner ignores the other

10 | evidence suggesting he was under the influence of the medication at the time of the accident and

11 | simply does not address the evidence of his erratic and dangerous driving while speeding. See

12 | RT 145-46, 172-173. The trial court did not apply federal law unreasonably in rejecting

13 | petitioner's claim that the admission of this evidence rendered the trial fundamentally unfair.

14 | V.  Response To Jury's Question

15 | The court instructed the jury in the language of CALJIC No. 17.10:

16 | The crime of vehicular manslaughter without gross negligence as charged
    | in Count I is lesser to that of the vehicular manslaughter with gross
17 | negligence, a felony. The first is a misdemeanor. The crime charged is a
    | felony in Count I. Thus, you are to determine where the defendant is
18 | guilty or not guilty of the crime charged in Count I or any of any lesser
    | crime. In doing so you have the discretion to chose the order in which you
19 | value each crime and consider the evidence pertaining to it. You may find
    | it productive to consider and reach a tentative conclusion on all charges
20 | and lesser crimes before reaching any final verdict. However, the Court
    | cannot accept a verdict, a guilty verdict on a lesser crime unless you have
21 | unanimously found the defendant not guilty of the charged crime. If you
    | are not satisfied beyond a reasonable doubt that the defendant is guilty of
22 | the crime charged in Count II, you may nevertheless convict him of any
    | lesser crime if you are convinced beyond a reasonable doubt that the
23 | defendant is guilty of the lesser crime.

24 | RT 450-451;[6] CT 105-106.

25 | _____

26 | [6] This instruction is taken verbatim from the reporter's transcript. It is not clear whether
    | the problems with the instruction as read come from the actual reading or from transcription

During the course of deliberations, the jury sent this note to the court:

> If we are unable to come to a unanimous decision re: gross vehicular manslaughter do we default to ordinary manslaughter or are we hung?  We do agree there is manslaughter.

CT 150; RT 498.  The court proposed to counsel that "we direct the jury to CALJIC 17.10" along with some further discussion of the jury's duty.  RT 498-499.  Petitioner's lawyer objected to anything but the reference to CALJIC No. 17.10.  RT 500.

The court then wrote to the jury:

> The court directs you to the last sentence of jury instruction CALJIC 17.10 which reads, "However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged crime."

CT 150; RT 501.

A second note from the jury read:

> The jury (in toto) is in agreement that there was gross vehicular manslaughter but one juror refuses to convict.  What do we do?

CT 152; RT 501.  The court decided to excuse the jurors for lunch and directed the bailiff to assemble them for further instruction at 1:00 p.m.  When they returned, they told the bailiff they wished to reconvene.  They then returned verdicts on both counts.  RT 504-506.

The Court of Appeal addressed petitioner's challenge to this process on appeal:

> . . . [T]he court's response to the jury was a concise and direct answer to the question it asked.  Nothing in the court's instruction contravened its prior full instruction with CALJIC No. 17.10.  It did not advise the jurors that they could not *consider* the lesser offense before acquitting defendant of the greater; it only told them they could not *return a verdict* on the lesser offense before acquitting defendant of the greater, which is a correct statement of the law.
>
> The jurors' question demonstrates they understood they were not precluded from considering the lesser offense because they already had done so.  The jurors stated they were in agreement that

error.

18

1   defendant was guilty of manslaughter, which establishes they had
2   deliberated concerning this offense and had reached a conclusion.
    They simply wanted to know whether they could return a verdict
3   on the lesser offense if they could not unanimously agree on the
    greater, or whether their lack of unanimity on the greater offense
4   meant they were hung.  The court's response correctly answered
    that an acquittal on the greater offense was necessary before
5   returning a verdict on the lesser one.

6   Lodg. Doc. 1 at 16-17 (emphases in original; internal citation omitted).

7          In the instant petition, petitioner argues his right to trial by jury was violated

8   because the court's instruction did not dispel the jury's confusion about the manslaughter charges

9   in general and about the potential that their division equated to a hung jury.  Pet. at 21.

10         Petitioner changes the focus of his argument in the traverse.  First, he argues that

11  under state law, the court was obliged to instruct that if the jury had a reasonable doubt as to

12  which type of manslaughter had occurred, it could find petitioner guilty only of the lesser.

13  Traverse at 8.  This was constitutional error, he continues, because the right to proof beyond a

14  reasonable doubt extends to the degree of criminal culpability.  Id. at 9.  From this, he concludes

15  that a criminal defendant is entitled to instructions that do not require the jurors to acquit of a

16  greater offense before turning to a consideration of lesser offenses.

17         As a threshold matter, it does not appear that this reformulation of the claim has

18  been exhausted in the state courts:  the petition for review presents the issue as one revolving

19  around the trial court's obligation to dispel the jury's confusion; it does not mount an explicit

20  challenge to what current counsel characterizes as an "acquittal first instruction."  Lodg. Doc. 2

21  at 18-22.  Indeed, state appellate counsel argued that the jury's question showed it "was

22  considering issues on which it had not been instructed" for there had been no instruction on a

23  hung jury and nothing mentioned default.  Id. at 19.  This meant, in appellate counsel's view, that

24  the jury did not understand how to proceed with the deliberative process "as regards the greater

25  and lesser vehicular manslaughter charges . . . ."  Id. at 20.  Counsel argued that had the court

26  referred the jury back to CALJIC No. 17.10 in its entirety, the jury would have been reminded of

1    its obligation to acquit of the greater if it was not satisfied of petitioner's guilt on that charge.  Id.

2    at 20-21.  Nevertheless, even if the issue as reformulated in the traverse is not exhausted, this

3    court may deny the claim if it finds it to be without merit.  Cassett v. Stewart, 406 F.3d 614,

4    623-24 (9th Cir. 2005).

5            In the petition itself, petitioner argues that the court's response to the jury's

6    question failed to address the jurors' confusion and so violated his right to trial by jury.  He relies

7    solely on Bollenbach v. United States, 326 U.S. 607, 612 (1946), which is, however, a decision

8    regarding federal criminal procedure, not a constitutional ruling.  Pet. at 20-21.

9            There is federal constitutional law on the question petitioner has now raised.  In

10   Weeks v. Angelone, 528 U.S. 225, 227 (2000), the Supreme Court addressed the "question

11   whether the Constitution is violated when a trial judge directs a capital jury's attention to a

12   specific paragraph of a constitutionally sufficient instruction in response to a question regarding

13   the proper consideration of mitigating circumstances" and held "it is not."

14           In Weeks, a capital case, the prosecutor focused its penalty phase presentation on

15   two aggravating factors.  After the jury retired to deliberate, jurors asked,

16               if we believe that Lonnie Weeks, Jr. is guilty of at least 1 of the
                 alternatives, then is it our duty as a jury to issue the death penalty?
17               Or must we decide (even though he is guilty of one of the
                 alternatives) whether or not to issue the death penalty, or one of the
18               life sentences?   What is the Rule?  Please clarify?

19   Id. at 229 (emphasis in original).  The court referred the jury to "the second paragraph of

20   Instruction # 2. . ." over defense counsel's objection that the jury should be instructed explicitly

21   that it could impose a life sentence even if it found both aggravating factors to be true.  Id. at 230.

22   Several hours later, however, the jury returned a death verdict.

23           In resolving Weeks' challenge, the Supreme Court observed that the trial judge

24   had given the jury an instruction on aggravating and mitigating factors that the Court itself had

25   /////

26   /////

approved and additional instruction on the jury's consideration of mitigating evidence.  The

Court continued:

> Given that petitioner's jury was adequately instructed, and given
> that the trial judge responded to the jury's question by directing its
> attention to the precise paragraph of the constitutionally adequate
> instruction that answers its inquiry, the question becomes whether
> the Constitution requires anything more.  We hold that it does not.

Id. at 234.  The Court concluded by observing that a jury is presumed to follow the trial court's

instructions and, after the answer to its question, Weeks' jury did not suggest it was still confused

about its role in deciding penalty questions.  Id.

As the Supreme Court has recently observed, "the type of answers given to the

jury here" – that is "pinpointed . . . answers to the particular instruction responsive to the

questions [which] reflected state law" – satisfy the Constitution.  Waddington v. Sarausad, __

U.S. __, 129 S.Ct. 823, 834 -35 (2009).

Although he does not discuss Weeks, respondent does refer to the Court of

Appeal's determination that petitioner's jury was properly instructed, a finding made in

connection with a different claim of error not presented in the habeas petition.  Answer at 15;

Lodg. Doc. 1 at 9-13.  In that claim of error, petitioner's state appellate counsel challenged the

trial court's failure to instruct separately on the elements of vehicular manslaughter without gross

negligence, a claim the Court of Appeal rejected because counsel "neglects to point to the

evidence that he believes raises a question as to whether all the elements of vehicular

manslaughter without gross negligence were present" and because "the instructions given by the

court adequately advised the jury regarding the lesser included offense . . . ."  Lodg. Doc. 1 at 11.

The court based this conclusion on the fact that the instructions on the charged offense defined

the elements and informed the jury that it must find that petitioner acted with gross negligence to

convict.  Id. at 12.  It also noted that the court defined ordinary negligence as well as gross

negligence.  Id.  In the Court of Appeal's view, these instructions, coupled with CALJIC No.

17.10, adequately told the jury it had to decide whether petitioner's actions constituted gross or

1   simple negligence before it could decide at all.  Id. at 13.  The court did not find, however, that

2   CALJIC No. 17.10  was a proper instruction because that issue was not presented to it.

3          Petitioner challenges this conclusion indirectly by suggesting the jury was not

4   instructed in accordance with People v. Dewberry, 51 Cal.2d 548, 555 (1959).  In Dewberry, the

5   California Supreme Court held that "when the evidence is sufficient to support a finding of guilt

6   of both the offense charged and a lesser included offense, the jury must be instructed that if they

7   entertain a reasonable doubt as to which offense has been committed, they must find the

8   defendant guilty only of the lesser offense."  Id. at 555.  California courts have held that when the

9   charged offense includes uncharged lesser offenses, the principles of Dewberry are satisfied

10  when the court instructs with CALJIC No. 17.10.  People v. Crone, 54 Cal.App.4th 71, 76

11  (1997).  But even if CALJIC No. 17.10 is not sufficient, petitioner would not be entitled to

12  federal habeas relief because of a failure to give a separate Dewberry instruction: this is a

13  question of California law, not cognizable on federal habeas.  See Estelle v. McGuire, 502 U.S.

14  62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court

15  determinations on state-law questions. In conducting habeas review, a federal court is limited to

16  deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

17         Next, petitioner cites to authority he claims shows that CALJIC No. 17.10 is not a

18  constitutionally adequate instruction.  He relies principally on Keeble v. United States, 412 U.S.

19  205 (1973), which he contends is a constitutionally based decision recognizing the right to

20  instructions on lesser included offenses.  Traverse at 8.  However, the issue in Keeble was

21  whether in prosecutions of Indians under the Major Crimes Act  defendants were entitled to

22  instructions on lesser included offenses that were otherwise permitted in federal criminal

23  /////

24  /////

25  /////

26  /////

prosecutions by the Federal Rules of Criminal Procedure.   <u>Keeble</u>, 412 U.S. at 213.  The Court said:

> [W]hile we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a criminal defendant to have the jury instructed on a lesser included offense, it is nevertheless clear that a construction of the Major Crimes Act to preclude such an instruction would raise difficult constitutional questions.  In view of our interpretation of the Act, those are questions that we need not face.

<u>Id</u>.  The other authority petitioner cites as condemning the acquittal first instruction is <u>United States v. Jackson</u>, 726 F.2d 1466 (9th Cir. 1984), which did not explicitly rely on the Constitution in reaching its result and indeed reviewed an instruction which, unlike CALJIC No. 17.10, forbade jurors from even considering a lesser offense until it had unanimously acquitted of the greater offense.  <u>Id</u>. at 1469-70.  Petitioner has not, however, addressed <u>Beck v. Alabama</u>, 447 U.S. 625, 637 (1980), which stated that the Constitution does not require any instruction on lesser included offenses in state non-capital trials, let alone instructions on choosing between one lesser included offense and another.[7]

Finally, the portion of the instruction the trial court referenced in its note to the jury addressed the issue raised by the jury.  The jury asked whether it could "default" to manslaughter without gross negligence if it failed to agree that petitioner had acted with gross negligence; it was asking in essence whether it could just skip the greater charge in favor of the lesser charge.  The court directed it to that portion of CALJIC No. 17.10 addressing this issue.

The trial court's response to the jury's question directed it to the paragraph of an adequate instruction addressing its concerns.  The Court of Appeal did not unreasonably apply clearly established federal law in rejecting petitioner's claim that this was error.

/////

---

[7]  The only cases this court has found that condemn an acquittal first instruction as a matter of federal constitutional law are capital habeas cases from the Sixth Circuit, which hold that such an instruction is error when given during the penalty phase of a capital prosecution.  <u>See</u> <u>Hartman v. Bagley</u>, 492 F.3d 347, 363 (6th Cir. 2007).

1       Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

2   writ of habeas corpus be denied.

3       These findings and recommendations are submitted to the United States District

4   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5   days after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties.  Such a document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8   shall be served and filed within ten days after service of the objections.  The parties are advised

9   that failure to file objections within the specified time may waive the right to appeal the District

10   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11   DATED:  September 23, 2009.

12

13                                        _____

14                                        U.S. MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26   2/tayl2528.submhc

24